IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| NEW CONCEPT MASSAGE & BEAUTY SCHOOL, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:26-cv-354 (RDA/WEF) |
| NATIONAL ACCREDITING COMMISSION OF CAREER ARTS AND SCIENCES, INC., | ) ) ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on New Concept Massage & Beauty School, Inc.'s

Motion for a Preliminary Injunction ("Motion") against National Accrediting Commission of

Career Arts and Sciences, Inc. requiring Defendant to reinstate and refrain from withdrawing the

accreditation of Plaintiff.  Dkt. 32.  Considering the Motion together with the Memorandum in

Support (Dkt. 33), Defendant's Opposition (Dkt. 43), Plaintiff's Supplemental Memorandum in

Support of the Motion for Preliminary Injunction (Dkt. 55), Defendant's Supplemental

Memorandum in Opposition (Dkt. 56), Defendant's Post-Hearing Brief in Support of its

Opposition (Dkt. 62), Plaintiff's Post-Hearing Brief in Support of its Motion for Preliminary

Injunction (Dkt. 63), as well as the argument and evidence heard during the April 29, 2026,

hearing, this Court GRANTS-IN-PART and DENIES-IN-PART the Motion.

## I. BACKGROUND

Plaintiff New Concept is a cosmetology school, which was formed in 1993, and today has

three (3) campuses in Miami, Florida. Dkt. 1 at 1.  Defendant NACCAS is an institutional

accrediting agency recognized by the U.S. Department of Education ("DOE"), pursuant to 20

U.S.C. § 1099b. *Id.* at 3. In order for Plaintiff to participate in Title IV programs for students to receive federal student aid, Plaintiff is required to be accredited by an accrediting agency recognized by the DOE. *Id.* Plaintiff has been accredited by Defendant for approximately twenty (20) years and was allowed/required to offer its students Title IV federal student aid for this period of time. *Id.* Defendant and its accredited institutions are governed by Defendant's Handbook, Bylaws, and Rules. Dkt. 62-1 ¶ 2; Dkt. 1-2.

Plaintiff's original founder and President Maria Mercedes Vazquez (the "Ms. Vazquez") died on November 13, 2024. *Id.* ¶ 32. She was also the sole owner and chief executive officer. Dkt. 62-1 ¶ 7. On August 10, 2020, Plaintiff submitted a Designated Owner Representative Form whereby Plaintiff designated Ms. Vazquez as Plaintiff's owner and provided that the "Address for All Correspondence" be 100 Lincoln Road, Unit #722, Miami Beach, Florida 33139. *Id.* ¶ 6. That address was Ms. Vazquez's home address. *Id.* ¶ 10.

In October 2024, Plaintiff issued share certificates to Ms. Vazquez's family members: (i) Ignacio Garcia (51 shares) ("I. Garcia"); (ii) Alexander Garcia (40 shares) ("A. Garcia"); and (iii) Matthew Guttierez (9 shares). *Id.* ¶ 8.

Ms. Vazquez passed away on November 13, 2024. *Id.* ¶ 9. In November 2024, both I. and A. Garcia reached out to Defendant regarding Ms. Vazquez's death. Dkt. 55-2 at 2-7. I. Garcia represented that he was now the president and majority shareholder of the business and provided Defendant with his contact information. *Id.* at 7. Both I. and A. Garcia were informed that Plaintiff should submit a Form #1A to reflect the change in ownership. *Id.* at 5.

In January 2025, A. Garcia submitted form #1H "Non-Substantive Change – Change of Official Contact Info" form to Defendant, whereby A. Garcia requested that he be the "Proposed Official Contact" person for Plaintiff. Dkt. 62-1 ¶ 18. A. Garcia confirmed that the "Current

2

Official Contact Information" for "All NACCAS Communications" was Ms. Vazquez at her home address.  *Id.*

In February 2025, I. Garcia emailed the Form #1A.  Dkt. 55-2 at 4.  Defendant instructed I. Garcia that it could not accept the application via email and instructed I. Garcia to either mail the document or upload it.  *Id.* at 3.

Plaintiff's fiscal year ended on December 31, 2024.  Dkt. 62-1 at 4.

On March 6, 2025, Plaintiff sent Form #1A via mail.  Dkt. 55-2. at 9.  This document represented that Ms. Vazquez's shares were being distributed 51% to Ignacio Garcia, 40% to Alexander Garcia, and 9% to Matthew Gutierrez, nephew of the two Garcia brothers and grandson of the late former owner.  *Id.* at 11-16.  Along with the ownership information, the form listed Ignacio Garcia as President of New Concept, stated that he was the primary contact, and provided a mailing and email address.  *Id.*

On March 10, 2025, A. Garcia filed a Petition for Administration of the Estate of Ms. Vazquez in Miami, Florida.  Dkt. 62-1 ¶ 23.

On April 28, 2025, A. Garcia emailed Defendant stating that he "did not approve" the March Form #1A application and that "ownership is in probate process and therefor[e] there is no current owner as we speak."  *Id.* ¶ 24.  The next day, Defendant emailed A. Garcia informing him that "the application return letter is currently pending and should be sent in the coming days."  *Id.* ¶ 25.  Defendant further stated that once it received an order "from the Probate Court appointing an executor to the estate that person will have official capacity to act on behalf of the state of the purpose of accreditation matters."  *Id.*

On April 30, 2025, Defendant issued a letter to Plaintiff at Ms. Vazquez's address asking Plaintiff to provide documentation proving that Ms. Vazquez's voting interests were transferred to I. Garcia, A. Garcia, and M. Gutierrez. *Id.* ¶ 26. Neither A. nor I. Garcia received that letter. *Id.*

On June 11, 2025, A. Garcia resigned from Plaintiff. *Id.* ¶ 29. A. Garcia was Plaintiff's financial aid officer and compliance officer. *Id.* ¶ 30.

Plaintiff was required to submit financial statements that are audited and submitted electronically by Plaintiff's independent Certified Public Accountant ("CPA") by June 30, 2025. *Id.* ¶ 27. Plaintiff failed to do so. *Id.* ¶ 28. A. Garcia ordinarily handled the financial audit submissions. *Id.* ¶ 30.

On June 30, 2025, Plaintiff submitted its Fiscal Year 2024 Audited Financial Statements to the U.S. Department of Education. *Id.* ¶ 31. On July 3, 2025, I. Garcia emailed Defendant information Defendant that I. Garcia was no longer associated with Plaintiff as of July 2, 2025. *Id.* ¶ 32. I. Garcia acknowledged that his prior Form #1A was "not official because Alexander was contesting it" and represented that "I[,] Ignacio Garcia[,] am now 91% owner" of Plaintiff. *Id.*

On July 8, 2025, Defendant acknowledged that A. Garcia was no longer with Plaintiff and inquired as to the status of the probate process. *Id.* ¶ 33. I. Garcia responded that the probate process was continuing. *Id.* ¶ 34.

On July 30, 2025, Gutierrez objected to the probate proceedings and to the appointment of I. Garcia as the personal representative of the estate. *Id.* ¶ 35.

On August 6, 2025, Defendant issued a "Letter of Inquiry" to Plaintiff at Ms. Vazquez's address. *Id.* ¶ 36. The Letter of Inquiry was signed for at that address, but Plaintiff asserts that it was not received by Plaintiff. *Id.* ¶ 37. The Letter of Inquiry was not returned as undeliverable. *Id.* ¶ 38. The Letter of Inquiry stated that Plaintiff had 15 days from receipt to provide evidence

that Plaintiff had complied with its obligation to submit the financial documentation otherwise a show cause order would issue. *Id.* ¶ 39. Plaintiff did not respond or otherwise submit financial statements for the 2024 fiscal year. *Id.* ¶ 40.

On October 16, 2025, Defendant issued a "Show Cause" to Ms. Vazquez's address. *Id.* ¶ 42. The Show Cause was signed for and not returned as undeliverable. *Id.* In the Show Cause, Defendant ordered Plaintiff to show cause why its accreditation should not be withdrawn for failing to submit its financial records. *Id.* ¶ 44. Plaintiff did not respond. *Id.* ¶ 45.

On October 30, 2025, I. Garcia and Gutierrez reached an agreement regarding ownership of Plaintiff. *Id.* ¶ 46.

On November 12, 2025, Defendant withdrew Plaintiff's accreditation for failure to submit audited financial statements for 2024 and provided Plaintiff with a right to appeal. *Id.* ¶ 47.

On November 20, 2025, Defendant's Associate Executive Director, Eddie Broomfield, explained that Defendant's Rules only allowed it to send accreditation information to: (i) the owner of an institution; (ii) someone who had explicit written authorization by the owner; or (iii) the court-appointed representative of an estate of the owner. *Id.* ¶ 48.

On November 21, 2025, counsel for Plaintiff, Ron Holt, emailed Defendant to provide an update on "unresolved ownership issues." *Id.* ¶ 49. Holt informed Defendant that an agreement had been reached between I. Garcia and A. Garcia whereby I. Garcia received 66 2/3% of the shares and that a Petition had been filed to appoint I. Garcia as personal representative, but that it had not yet been finalized nor had any share certificates issued. *Id.*

On November 25, 2025, Defendant responded to inform Holt that I. Garcia's Change of Ownership was on hold and that Defendant would recognize the personal representative of the estate as having authority for purposes of accrediting activities. *Id.* ¶ 50. Defendant also informed

Holt about the missing 2024 financial information. *Id.* Plaintiff contends that November 25, 2025, was the first time that Plaintiff learned of the missing financial information. *Id.* ¶ 51.

On December 2, 2025, I. Garcia emailed Defendant regarding the missing financial information. *Id.* ¶ 52. That same day, Defendant responded that Plaintiff's financial information was required to be submitted electronically through Defendant's portal by the auditor or CPA firm who performed the audit. *Id.*

On December 12, 2025, Defendant issued a letter to Plaintiff at Ms. Vazquez's address informing Plaintiff of the decision to withdraw Plaintiff's accreditation. *Id.* ¶ 53. Plaintiff has never before failed to file its financial documents or been in danger of losing its accreditation status for failing to do so. *Id.* ¶ 54. The Letter was signed for at Ms. Vazquez's address and was not returned as undeliverable. *Id.* ¶ 55.[1]

On December 26, 2025, I. Garcia responded to Defendant indicating that his accountant was attempting to file the financial records, but that A. Garcia had created the account and no one had the account information. *Id.* ¶ 56. That same day, I. Garcia forwarded his CPA's email attaching the 2024 audited financial statements. *Id.* ¶ 57.

On January 8, 2026, Defendant issued a letter to Plaintiff at Ms. Vazquez's address informing Plaintiff that, because it did not appeal, the decision was final and the accreditation would be withdrawn. *Id.* ¶ 58. Plaintiff contends that it did not receive the Final Letter, but it was signed for and not returned as undeliverable. *Id.* ¶ 59.

On January 16, 2026, I. Garcia was appointed as personal representative. *Id.* ¶ 60.

---

[1] The UPS confirmations indicate that the various letters were received by individuals named "Noel" and "Lisandro." Dkt. 56-3.

On February 5, 2026, Plaintiff brought claims against Defendant in this Court for violation of due process.  Dkt. 1.  The same day that Plaintiff filed its Complaint, it filed a Motion for a Temporary Restraining Order ("TRO") (Dkt. 7) along with a Memorandum in Support (Dkt. 8).  Plaintiff requested that this Court issue a TRO requiring Defendant to refrain from withdrawing its accreditation as an educational institution, to reinstate Plaintiff's accreditation which Defendant terminated on or about December 12, 2025, and to refrain from taking further action against New Concept without providing due process of law.  Dkt. 7.  The Court heard oral argument on the TRO on February 11, 2026.  On February 16, 2026, the Court issued a Memorandum Opinion and Order ("TRO Opinion") granting the TRO in part and ordering that Defendant reopen the appeal period for twenty days to allow Plaintiff to challenge the withdrawal of its accreditation and deferring the TRO in part as to the decision whether accreditation should be restored.  Dkt. 22.

Subsequently, on February 18, 2026, Plaintiff filed a Motion for Reconsideration or for Clarification (Dkt. 24) and a Memorandum in Support (Dkt. 25).  On February 20, 2026, Defendant filed a response to the Motion for Reconsideration (Dkt. 27).  That same day, the Court denied Plaintiff's Motion for Reconsideration.  Dkt. 28.

On February 28, 2026, Plaintiff filed a Motion for a Preliminary Injunction (Dkt. 32), along with a Memorandum in Support (Dkt. 33).  On March 3, 2026, Defendant filed a Motion for Discovery in Aid of Defending the Motion for Preliminary Injunction.  Dkt. 35.  On March 4, 2026, the Court granted Defendant's Motion for Discovery, allowing Defendant to take two depositions, issue seven interrogatories, and issue seven requests for production, and continuing the hearing on the Preliminary Injunction Motion until the completion of discovery.  Dkt. 37.  On March 12, 2026, Plaintiff filed its own Motion for Discovery related to its Motion for a Preliminary Injunction (Dkt. 40), along with a Memorandum in Support (Dkt. 41).  On March 16, 2026,

Defendant filed its Motion in Opposition to Plaintiff's Motion for a Preliminary Injunction (Dkt. 43) and a Memorandum in Support for its Motion to Dismiss (Dkt. 44). On March 25, 2026, the Court granted Plaintiff's Motion for Discovery in Aid of its Preliminary Injunction. Dkt. 48. On April 20, 2026, Defendant filed a Motion in Limine (Dkt. 49) and a Memorandum in Support (Dkt. 50). On April 21, 2026, Plaintiff filed its Opposition to the Motion in Limine. Dkt. 53.

On April 21, 2026, the Court ordered the parties to provide supplemental briefing updating their positions on the merits of the Preliminary Injunction Motion with any relevant evidence from discovery, and to include details regarding the status of the appeal. Dkt. 54. On April 24, 2026, Plaintiff filed its Supplemental Briefing in Support of its Motion for a Preliminary Injunction (Dkt. 55) and Defendant filed its Supplemental Briefing in Opposition to the Motion for a Preliminary Injunction (Dkt. 56).

On April 29, 2026, this Court held a hearing on the Motion and heard arguments from the parties. Dkt. 61. Plaintiff produced testimony by I. Garcia and Holt. Dkt. 61. Defendant produced evidence by Darin Wallace. *Id.* Of particular note, Wallace testified that, even after Ms. Vazquez passed, notices would only be sent to the address that she had provided and that, because Defendant only permitted Plaintiff to act through its owner, once Ms. Vazquez passed, there was nothing that Plaintiff could do to attempt to save or attempt to restore its accreditation.

On May 4, 2026, the parties filed Post-Hearing Supplemental Briefs. Dkts. 62, 63.

## II. STANDARD OF REVIEW

A motion for a preliminary injunction is subject to the requirements of Federal Rule of Civil Procedure 65. "A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Perry v. Judd*, 471 Fed. App'x 219, 223 (4th Cir. 2012) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22

(2008)).  "[G]ranting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way."  *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994).  A grant of preliminary injunctive relief requires the movant to establish the following four factors: (1) the likelihood of irreparable harm to the plaintiff if preliminary relief is denied; (2) the likelihood of harm to the defendants if the preliminary injunction is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest.  *Winter*, 555 U.S. at 20.

### III. ANALYSIS

Plaintiff seeks a Preliminary Injunction against Defendant requiring Defendant to refrain from withdrawing Plaintiff's accreditation, to reinstate Plaintiff's accreditation which Defendant terminated on or about December 12, 2025, and to refrain from taking further action against Plaintiff without providing due process of law while Plaintiff pursues its appeal.  Dkt. 33.  Defendant argues that the Court should refrain from ordering further relief as unwarranted, as improperly reaching the merits of the accreditation decision, and as interfering with the course of action under the NACCAS Rules.  For the reasons set forth below, the Court will grant-in-part and deny-in-part the Motion.

### A. Likelihood of Success on the Merits

As previously addressed in its TRO Opinion, the Court finds that Plaintiff is likely to be successful on the merits.  As the parties' stipulation and the evidence adduced at the hearing establish, although Defendant mailed several notices regarding Plaintiff's accreditation status to Ms. Vazquez, Defendant was aware that Ms. Vazquez had passed and that there was a dispute over her estate.  Yet, Defendant never ensured that the individuals with a stake in Plaintiff's accreditation status received notice of Defendant's actions with respect to Plaintiff's accreditation.

9

Indeed, Defendant introduced testimony that: (i) pursuant to Defendant's Rules, Defendant could proceed with revoking Plaintiff's accreditation during the pendency of probate proceedings regarding ownership of Plaintiff but (ii) no individual could attempt to save or appeal the loss of that accreditation status based on those same Rules because Plaintiff could only act through an owner or personal representative and the probate court had not yet acted to appoint either one. Thus, once the wheels were in motion regarding the loss of accreditation, Defendant's own rules prevented Plaintiff from being able to save itself. The failure to provide notice to Plaintiff's stakeholders during the pendency of the probate process – despite knowledge of Ms. Vazquez's passing and knowledge of the existence of the probate proceedings – as well as the failure to provide an avenue by which Plaintiff could act while proceedings against it commenced reflect a violation of principles of due process.

In an action challenging an accreditation agency's revocation of accreditation, courts owe "great deference" to the agency's decision. *See Wilfred Acad. of Hair and Beauty Culture v. S. Ass'n of Coll. and Schools*, 957 F.2d 210, 214 (5th Cir. 1992) (citing *Medical Inst. of Minnesota*, 817 F.2d 1310, 1314 (8th Cir.1987)); *St. Andrews Presbyterian Coll. v. S. Ass'n of Coll. & Schools*, 2007 WL 4219402, at *3 (M.D.N.C. Nov. 29, 2007). This is because "[t]he standards of accreditation are not guides for the layman but for professionals in the field of education." *Parsons College v. North Central Ass'n of Colleges and Secondary Schools*, 271 F. Supp. 65, 73 (N.D. Ill. 1967). When adjudicating common law due process claims against accreditation agencies, courts should "focus primarily on whether the accrediting body's internal rules provide[d] a fair and impartial procedure and whether it [followed] its rules in reaching its decision." *Professional Massage Training Center, Inc. v. Accreditation Alliance of Career Schools and Colleges*, 781 F.3d 161 (4th Cir. 2015) (*citing Parsons College*, 271 F. Supp. at 65). In light of the deference due,

10

"[f]ederal courts have consistently limited their review of decisions of accrediting associations to whether the decisions were *arbitrary and unreasonable . . . ."*  *Wilfred Acad.*, 957 F.2d at 214 (internal quotes and citations omitted) (emphasis added).

"Arbitrary and unreasonable" is a high bar, but the circumstances in this case suggest that Plaintiff can meet that bar, and it is likely that Plaintiff will be successful on the merits of its claim of Denial of Due Process.  Although Defendant followed its published rules,[2] Defendant's decision to continuously send notices to Ms. Vazquez's address despite notice that she had passed is unreasonable; this is especially so given Defendant's knowledge that stakeholders were not receiving such notices and that there was a dispute as to ownership.  In this regard, Plaintiff's unclean hands argument in this regard rings hollow, where on the one hand Defendant argues that Plaintiff could do nothing because Plaintiff lacked an owner able to act on its behalf due to the probate proceedings, yet on the other hand argues that "New Concept" failed to retrieve the mail that Defendant sent it at Ms. Vazquez's address (which it refused to let Plaintiff change or update, again to the lack of an owner).  Indeed, despite failing to recognize I. Garcia as able to act on behalf of Plaintiff during this time period, Defendant conflates that actions of I. Garcia with Plaintiff, in arguing that Plaintiff was dilatory.  Dkt. 56 at 7 (arguing "*New Concept* was dilatory in seeking appointment of a personal representative" (emphasis added)).  By failing to provide notice to a stakeholder who could act on behalf of Plaintiff and by precluding stakeholders from acting on behalf of Plaintiff while proceeding with a revocation of Plaintiff's accreditation status, Plaintiff appears likely able to show that Defendant failed to provide Plaintiff with notice, an opportunity to be heard, or an opportunity to appeal.  34 C.F.R. § 602.25(e); *id.* § 602.25(f).  As

---

[2] Defendant cites Sections 7.1(a), 7.1(c), 7.2(b), 7.2(d) and 7.5 of its Rules as the Rules relevant to the actions taken in this matter.  Dkt. 16 at 2.

11

courts have recognized, the essential elements of due process in this context are "notice and opportunity to respond" *Auburn Univ. v. S. Ass'n of Colleges and Schools, Inc.*, 489 F. Supp. 2d 1362, 1374 (N.D. Ga. 2002). Because Plaintiff could not act without an owner and could not change its ownership without an order from the probate court, Plaintiff was deprived of an opportunity to be heard with respect to the revocation of its accreditation. *See Edwards Waters College, Inc. v. S. Ass'n of Colleges and Schools, Inc.*, 2005 WL 6218035, at *11 (M.D. Fla. Mar. 11, 2005) ("Thus, with no opportunity to be heard by either the actual decision-maker (the Commission) or the body upon which it exclusively relied (the Executive Council), the College had now lost its accreditation, in part for reasons about which it had not notice.").

Importantly, in other contexts, Defendant recognized that potentially lengthy probate proceedings could interfere with a member school's ability to comply with Defendant's Rules. As Broomfield recognized in his emails with I. Garcia, the conclusion of the probate process "may be several weeks or months" after the death of an owner. Dkt. 55-2 at 5. That was why Defendant did not require the Form #1A to filed until 90 days after the resolution of issues of ownership by the probate court. *Id.* Yet, the lack of that Form #1A, which Defendant reasonably did not require to be filed (and, indeed, Defendant refused to accept I. Garcia's Form #1A) until after probate issues were resolved, precluded Plaintiff from acting with respect to its accreditation. Although Defendant summarized its actions as reasonable, because it cannot "send confidential information to non-owners of its accredited schools, particularly those who are actively disputing the ownership structure," Dkt. 62 at 4, this practice affirmatively prevents Plaintiff from being afforded an opportunity to defend itself *where its only owner is deceased*. Accordingly, Plaintiff has demonstrated a likelihood of success in this regard.

B. Likelihood of Irreparable Harm

On December 12, 2025, Defendant rescinded Plaintiff's accreditation.  Dkt. 16 at 1. Because of the loss of its accreditation, Plaintiff states that it cannot offer its current or prospective students Title IV federal student aid.  Dkt. 8 at 12.  Plaintiff further states that this loss of funding has already resulted in a substantial decrease in new enrollees and that, if the institution continues without accreditation, it will have to begin terminating its employees and turning away students to their competitors.  *Id.*  At the Preliminary Injunction Hearing, Plaintiff's President and CEO I. Garcia testified that the institution was in imminent financial danger due to the lack of funds because of the withdrawal of its accreditation status.  Dkt. 61.  Garcia testified that the institution was at risk of closing locations and terminating staff after already cutting salaries and compensation for some employees.  *Id.*

Defendant is unlikely to suffer any cognizable harm from the issuance of a limited Preliminary Injunction, as discussed *infra*, which would only permit Plaintiff the same benefits as any other institution undergoing the appeals process.  In similar circumstances, courts have found that the balance of harms tips in favor of the schools because, absent accreditation, existing or prospective students would lose what was presumptively a valuable institution performing an important service.  *See Florida College of Business v. Accrediting Council for Independent Colleges and Schools*, 954 F. Supp. 256, 260 (S.D. Fl. 1996); *see also Hampton University v. Accreditation Council for Pharmaceutical Education*, 611 F. Supp. 2d 557 (E.D. Va. 2009) (finding that withdrawal of the school's accreditation might effectively sound the death knell for the school); *see also Dekalb County School District v. Georgia State Board of Education*, 2013 WL 791266, at *7 (N.D. Ga. Mar. 4, 2013) (holding that the loss of accreditation to the school district and resulting harm to the students in the district are profound).

Plaintiff faces the same fate. Without temporary restoration of accreditation pending appeal, Plaintiff will not be able to restore funding for students or pay its employees, both of which are essential to their operations. Students who are unable to secure alternative funding will not be able to continue their education at the school, and prospective students will be dissuaded from enrolling. As I. Garcia testified, these harms have already begun to unfold as Plaintiff has experienced a decrease in enrollment since the withdrawal of its accreditation. Plaintiff has been unable to obtain Title IV funds and may be forced to close some or all of its campuses if the lapse in accreditation persists. If Plaintiff remains unaccredited for a significant period, it will result in reputational harm and a loss of goodwill. *See Professional Massage Training Center, Inc. v. Accreditation Alliance of Career Schools and Colleges*, 951 F. Supp. 2d 851, 854 (E.D. Va. 2012) (finding that in addition to the loss of students to competitors, loss of accreditation results in a loss of goodwill). Thus, the harm caused to Plaintiff by not having restoration of its accreditation pending the outcome of its appeal is irreparable, and the harm to Defendant by the issuance of this Preliminary Injunction is unlikely.

## C. Public Interest

Finally, a Preliminary Injunction that temporarily restores Plaintiff's accreditation pending appeal serves the public interest rather than harms it. This would allow Plaintiff to continue its educational and business operations during its appeal process and allow Defendant to adjudicate its claims. Any matter involving an institution of higher learning will implicate the public interest, locally and (varying with the geographic reach of the particular school) even nationally or internationally. *Hampton University*, 611 F. Supp. 2d 569. The Court cannot identify any critical public interest that would be adversely affected by the partial grant of a temporary restraining order reinstating Plaintiff's accreditation during its appeal especially because Defendant's policies allow

14

for that.  Accordingly, this factor therefore also counsels in favor of granting the Preliminary Injunction.

### D. Plaintiff's Accreditation Status During Appeal

Defendant cites the Court's TRO Opinion and argues that the relief Plaintiff seeks, restoration of accreditation, goes far beyond the focus of procedural fairness to refashion the accreditation decision on the merits.  Dkt. 43 at 1.  Defendant misconstrues the Court's prior Memorandum Opinion and Order.

The Court's TRO Opinion sought to provide Plaintiff with the same status as any party undergoing an appeal.  That is, assuming that Plaintiff filed an appeal in the reopened appeal period (which it did), Plaintiff should be treated the same as any other appellant.  By statute, an institution of higher education maintains its accreditation during the pendency of the appeal and any subsequent arbitration "prior to such action becoming final." 20 U.S.C. § 1099b(a)(6)(C).  The Court did not itself restore Plaintiff's accreditation because that would merge with the merits of the dispute and because it was incumbent upon Plaintiff to file the appeal.  But Defendant is not entitled to treat Plaintiff differently from other parties who pursue an appeal due to the vagaries of circumstance at issue here.  Indeed, Sections 9.0(c) and 9.19(a) of Defendant's Rules specifically provide that an institution retains its accreditation during the pendency of an appeal.  *See* National Accrediting Commission of Career Arts & Sciences, 2026 NACCAS Handbook 123 (stating in Section 9.0(c) that an institution retains its accreditation status while undergoing an appeal).  To the extent that Defendant has not done so, it is a violation of Defendant's own Rules and of this Court's TRO Opinion.[3]  Thus, given that Defendant has apparently not followed its own Rules

---

[3] To the extent that Defendant inferred that restoration was not required because the Court denied the Motion for Clarification, the Court denied the Motion for Clarification because the Court's TRO Opinion was clear: the appeal window was reopened, and it was incumbent on

with respect to Plaintiff's treatment during the pending appeal, the Court will grant the Preliminary Injunction only insofar as it seeks restoration of Plaintiff's accreditation pending appeal in accordance with Defendant's Rules, the applicable regulations, and statute.  Specifically, the Court will grant Plaintiff's Motion for a Preliminary Injunction in part and order that Defendant restore Plaintiff's accreditation on a temporary basis pending a final decision on appeal, arbitration, or ruling on the merits of this case by this Court.

E.    Security Bond

In addition, courts "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  A district court has discretion to set the bond amount where it deems proper, but "it is not free to disregard the bond requirement altogether."  *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999).  The previously posted bond of $5,000 shall therefore remain posted.

IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the Motion (Dkt. 32) is GRANTED-IN-PART and DENIED-IN-PART.  The Motion is granted insofar as Defendant will be directed to restore Plaintiff's accreditation during the pendency of its appeal.  The Motion is denied as moot insofar as it seeks to reopen Plaintiff's window to appeal the withdrawal of its accreditation.  In all other respects, the Motion is denied; and it is

---

Plaintiff to file an appeal.  The Court's TRO Opinion left no room for Defendant to fail to abide by its own Rules with respect to such an appeal.  Once the appeal was filed and Defendant refused to reinstate Plaintiff's accreditation pursuant to its Rules, Plaintiff could have filed a Motion to Enforce, but it did not.

FURTHER ORDERED that Defendant is DIRECTED to restore Plaintiff's accreditation during the pendency of its appeal in accordance with the applicable statutes, regulations, and Defendant's Rules until a final ruling on the merits either as a function of the appeal or pursuant to ruling by this Court; and it is

FURTHER ORDERED that Defendant's Motion in Limine (Dkt. 49) is DENIED; and it is

FURTHER ORDERED that Defendant's Motion for Electronic Device Application (Dkt. 52) is DENIED AS MOOT; and it is

FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 65(c), the previously posted bond of $5,000 shall remain posted with respect to the preliminary injunction granted herein.

It is SO ORDERED.

Alexandria, Virginia
May 13, 2026

_____ /s/
Rossie D. Alston, Jr.
United States District Judge